USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: __9/10/2020__

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------X
VIDA J. AFRIYIE *o/b/o* D.K.B., *a minor,*      :
                                                :
                Plaintiff,                      :
                                                :        **OPINION AND ORDER**
        -against-                               :
                                                :        19-CV-4635 (JLC)
ANDREW M. SAUL,                                 :
Commissioner of Social Security,                :
                                                :
                Defendant.                      :
                                                :
------------------------------------------------------------X

**JAMES L. COTT, United States Magistrate Judge.**

Plaintiff Vida J. Afriyie, on behalf of her minor son D.K.B., seeks judicial
review of the decision of defendant Andrew M. Saul, the Commissioner of the Social
Security Administration, denying her son supplemental security income benefits
under the Social Security Act. Afriyie has moved for judgment on the pleadings,
requesting that the Court reverse the Commissioner's decision and remand the case
solely for the calculation of benefits. The Commissioner has cross-moved for
judgment on the pleadings, contending that his determination is supported by
substantial evidence and should be affirmed. For the reasons set forth below,
Afriyie's motion is granted in part, the Commissioner's cross-motion is denied, and
the case is remanded for further administrative proceedings.

# I. BACKGROUND

## A. Procedural Background

Afriyie applied for Supplemental Security Income ("SSI") disability benefits for her minor son D.K.B. on June 7, 2016. Administrative Record ("AR"), Dkt. No. 9, at 137–45.[1] The Social Security Administration ("SSA") denied the claim on August 23, 2016, after which Afriyie filed a written request for a hearing in front of an Administrative Law Judge ("ALJ"). *Id.* at 68–77, 85–87. Afriyie and her son appeared *pro se* before ALJ Brian G. Kanner at a hearing held on February 22, 2018; also present was Enoch Mensah, D.K.B.'s social worker. *Id.* at 39–67. In a decision dated July 12, 2018, the ALJ concluded that D.K.B. was not disabled. *Id.* at 16–38. The ALJ's decision was rendered final on April 9, 2019, when the SSA Appeals Council denied Afriyie's request for review. *Id.* at 1–3.

Initially proceeding *pro se,* Afriyie commenced the present action on May 20, 2019 by filing a complaint seeking judicial review of the Commissioner's decision pursuant to 42 U.S.C. § 405(g). Complaint, Dkt. No. 2. The Commissioner answered Afriyie's complaint by filing the administrative record on October 1, 2019. AR, Dkt. No. 9. James M. Baker, Esq., filed a notice of appearance for Afriyie on November 19, 2019. Dkt. No. 11. Afriyie moved for judgment on the pleadings on January 31, 2020, Dkt. No. 17, seeking remand solely for the calculation of benefits, and submitted a memorandum in support of her motion. Pl. Mem., Dkt. No. 18.

---

[1] The page numbers refer to the sequential numbering of the Administrative Record provided on the bottom right corner of the page, not the numbers produced by the Electronic Case Filing System.

The Commissioner cross-moved for judgment on the pleadings on May 12, 2020,

Dkt. No. 24, and submitted a memorandum of law in support of his cross-motion.

Def. Mem., Dkt. No. 25.  Afriyie filed her reply on May 29, 2020.  Pl. Reply, Dkt. No.

26.  The parties have consented to my jurisdiction over this case for all purposes.

Dkt. No. 21.

## B.   The Administrative Record

D.K.B. was born on June 22, 2015, and was 11 months old when Afriyie filed

for benefits on June 7, 2016.  AR at 137.  At the time of the hearing on February 22,

2018, D.K.B. was nearly three years old, and lived with Afriyie in the Bronx.  *See id.*

at 39.  On the SSI application, Afriyie initially alleged that D.K.B. suffered from

"[a]sthma, separation anxiety, severe coughing and sleepiness," with an alleged

disability onset date of September 1, 2015.  *Id.* at 137, 168.  At the hearing,

however, Afriyie testified that her son's condition had worsened to include

significant learning delays, for which he received speech therapy, occupational

therapy, and special instruction twice a week.  *Id.* at 52.  In light of D.K.B.'s speech

and cognitive delays, he was approved for special education by the New York City

Board of Education beginning in the fall of 2018.  *Id.* at 63–65.

### 1.   Relevant Medical Evidence

#### a.  Hospital and Pediatrician Treatment Notes

The record includes treatment notes from two emergency room visits D.K.B.

made to Bronx Lebanon Hospital for asthma-related symptoms.  AR at 203–11.  At

each visit, on March 30, 2016 and May 2, 2016, he was admitted with a cough,

wheezing, and fever.  *Id.* at 204, 208.  D.K.B. was diagnosed with acute bronchitis in March and acute respiratory distress in May, and on each occasion he became stable upon treatment.  *Id.* at 206, 210.

Office notes from pediatrician Baah Asante, M.D., that span from January 25, 2016 to October 4, 2016 also appear in the record.  *Id.* at 325–36.  D.K.B. occasionally presented to Dr. Asante with a cough, *id.* at 329, 333, 336, but consistently had normal respiratory exams.  *Id.* at 327, 330, 332, 335.  Dr. Asante diagnosed D.K.B. with asthma on June 25, 2016.  *Id.* at 330.  In an August 1, 2017 Child & Adolescent Health Examination Form for the NYC Department of Health & Mental Hygiene, Dr. Asante also assessed D.K.B. to have a speech delay, but otherwise categorized D.K.B. as a "well" two-year-old boy.  *Id.* at 325.

### b. Early Intervention Materials

#### i. May 2017 Evaluations—Our Children First, Inc.

On May 15, 2017, licensed providers from Our Children First, Inc., evaluated D.K.B. for eligibility for the New York State Early Intervention Program.  AR at 515–45.  At the time, D.K.B. was 22 months old.  The evaluators found a 25 percent or more delay in the domain of communication, but that he otherwise did not have eligible delays in the adaptive, cognitive, physical, or social/emotional domains.  *Id.* at 515.

With respect to communication, speech language pathologist Clara Grogan, M.A. CCC-SLP, TSSLD, found that D.K.B. could follow simple directions with repetitions, and was able to communicate needs with gestures and vocalizations.

*Id.* at 521.  He was not able to name familiar objects, pictures, or body parts, and could only say "mama" and "baba."  *Id.* at 538.  His language skills were assessed to be delayed by 25 percent, *id.* at 519, although D.K.B. was also described as having a "severe" expressive language delay of 33 percent, *id.* at 520.  Developmental surveillance was recommended, in addition to re-evaluation in three to six months provided that his abilities did not improve.  *Id.* at 521.

Special education teacher Elena Zea, MS Ed., assessed that D.K.B. was "functioning within normal limits" in terms of cognitive development.  *Id.* at 526. He was alert, with good attention span, and was able to match similar objects and pictures to objects.  *Id.* at 521, 526.  With respect to the social-emotional domain, D.K.B. was reportedly affectionate with family members, but would get upset and cry when he did not get his way.  *Id.* at 527.  As to adaptive functioning, D.K.B. was cooperative, could use a spoon, and could eat by himself, but he did not indicate when his diaper was wet or soiled.  *Id.*

Physical therapist Martha Londono, PT, assessed that, physically, D.K.B. was slightly bowlegged but walked without difficulty, and could throw and kick a ball and negotiate stairs.  *Id.* at 542–44.  She evaluated D.K.B.'s gross motor functioning to be at a 0.1 standard deviation below average, and did not recommend physical therapy at the time.  *Id.* at 544.  D.K.B. could also turn one page of a book at a time and put shapes in a form board.  *Id.* at 528.

### ii. August 2017 Evaluations—Ability Builders for Children, LLC

At the age of 25 months, between August 3, 2017 and August 14, 2017, D.K.B. was reevaluated for early intervention services by licensed providers from Ability Builders, LLC. *Id.* at 224–85. D.K.B. was found to have eligible delays in the cognitive, communication, and physical domains. *Id.* at 233. In particular, D.K.B. had 25 percent or more delays in cognitive and physical domains, and a 33 percent or more delay in communication. *Id.* As a result, he was deemed to be eligible for early intervention services, with recommended speech therapy, occupational therapy, and special instruction. *Id.* at 234. A psychological evaluation was also requested. *Id.*

Special education teacher Nicole Brown, MS Ed., assessed D.K.B. using the Developmental Assessment of Young Children ("DAYC-2"), the Hawaii Early Learning Profile ("HELP") Strands Development Assessment (0-3), a parent interview, and observation. *Id.* at 255. Brown reported that D.K.B. was functioning with delays in cognition (specifically at an equivalence of 13–18 months, or 28 percent delay) and delays in communication (at an equivalence of 12–17 months in receptive language, or a 32 percent delay, and 12–14.5 months in expressive language, or a greater than 33 percent delay). *Id.* at 257–58, 260. His functioning within other domains, including socio-emotional development, gross and fine motor development, and adaptive behavior were measured to be within normal limits. *Id.* at 258–59.

Physical therapist Krishna Finkenberg, PT, who assessed D.K.B.'s muscle tone, locomotion, object manipulation, and movement, found less than a 25 percent delay in gross motor skills, placing him within normal limits.  *Id.* at 262–65.

Occupational therapist Tyra M. Banks, MS, OTR/L, who assessed D.K.B.'s fine motor skills using the Peabody Developmental Motor Scales, 2nd Edition ("PDMS-2"), found an overall 25 percent fine motor delay.  *Id.* at 284.  In particular, she found that D.K.B. had difficulty processing auditory, tactile, and oral information, coordinating the small muscles of his hands, and discriminating between shapes and forms. *Id.* at 283.  He also had difficulties with hand-eye coordination and muscle weakness.  *Id.*

Speech language pathologist Arlene Francis, M.S. CCC/SLP, conducted a Bilingual Twi Speech and Language Evaluation and reported that D.K.B. presented with a greater than 25 percent delay in expressive and receptive language.  *Id.* at 274.  D.K.B. did not produce any true words during the evaluation, but vocalized sounds and grunting noises and interacted with his mother using physical actions. *Id.* at 268.  He had a vocabulary of less than 10 words, although children aged 18–24 months are expected to have a vocabulary of approximately 50 words.  *Id.* at 273. Speech therapy was recommended.  *Id.* at 274.

### iii.  December 2017 Evaluations—All About Kids

D.K.B. was again reevaluated for early intervention services between December 1 and December 26, 2017, when he was nearly two-and-a-half years old. *Id.* at 309–18.  He also received formal intelligence testing.  *Id.* at 295–301.  The

evaluations were administered by licensed professionals from All About Kids.  *Id.* at 291–324.

Clinical psychologist Irene Giusti, Ph.D., interviewed D.K.B. and Afriyie and administered the Bayley Scales for Infant Development III and the Vineland Adaptive Behavior Scales III.  *Id.* at 296.  D.K.B.'s non-verbal cognitive skills were assessed to be in the average range and his verbal cognitive skills in the borderline range, at the 4th percentile.  *Id.* at 296–300.  Within verbal cognition, D.K.B.'s receptive communication was in the low average range, and his expressive communication was in the extremely low range.  *Id.* at 297.  His overall adaptive functioning was classified as moderately low.  *Id.* at 298.

Speech pathologist Erica E. Fernandez, M.S. CCC-SLP/TSSLD, evaluated D.K.B. via the Preschool Language Scale-5th Edition ("PLS-5") on December 26, 2017.  *Id.* at 309–13.  D.K.B. scored a 63 in expressive communications, falling within the 1st percentile (at a standard deviation of 2.46 below the mean).  *Id.* at 311.  D.K.B. similarly tested within the 1st percentile in auditory comprehension, with a score of 65 (at a standard deviation of 2.33 below the mean).  *Id.*  His total language score was 62, also within the 1st percentile, and at a standard deviation of 2.53 below the mean.  *Id.*  Given D.K.B.'s severe delays in auditory comprehension and expressive language, Fernandez assessed a mixed receptive/expressive language disorder.  *Id.* at 311, 313.  She recommended speech and language intervention but qualified that "the final recommendations and eligibility [for such

intervention] will be made in conjunction with other reports and with the parent(s) at the [Committee on Preschool Special Education, ("CPSE")] meeting." *Id.* at 313.

Occupational therapist Faustina Adza, B.S., OTR/L, administered the PDMS-2 and assessed D.K.B.'s Fine Motor Quotient ("FMQ") to be 67, representing an "overall very poor performance in the fine motor subtest" at a standard deviation of 2.20 below the mean. *Id.* at 316. D.K.B. was found to be functioning at an age equivalent of 13 months. *Id.* As compared with previous testing, his scores demonstrated decreased muscle strength, motor planning skills, oral motor skills, and tolerance for motor activities. *Id.* at 316–17. Adza assessed a sensory processing and modulation disorder. *Id.* at 317.

### iv.  Progress Reports

Speech language pathologist Alyce Rouse, M.S., CCC-SLP, of Hear Our Voices, conducted an evaluation for the early intervention program based on D.K.B.'s progress from September 13, 2017 to November 21, 2017 (before the December 2017 All About Kids evaluations). *Id.* at 559–62. She reported that D.K.B. required the use of visual cues to successfully carry out functional outcomes. *Id.* at 560. Overall, D.K.B. had made moderate progress in his functional abilities since therapy began. *Id.* at 562. No changes were made to his service plan. *Id.* at 560.

Occupational therapists Adrian Lawrence, OT, and Janice Darien, OTR/L, completed a progress note on behalf of D.K.B. on January 21, 2018. *Id.* at 567–71. D.K.B. was found to have made little progress in his fine motor skills and his ability

to follow directions and comprehend how to play appropriately.  *Id.* at 567.  He "continue[d] to present with a 30% delay in fine and visual motor skill development," and needed help in certain tasks, such as grabbing a spoon.  *Id.* at 569–70.  He was recorded as having an "extremely short attention span of 2 minutes," which "hinders his ability to complete fine motor tasks.  *Id.* at 570.

Special Educator James Williams of All About Kids reviewed D.K.B.'s progress from August 25, 2017 to February 6, 2018.  *Id.* at 563–66.  Overall, D.K.B. was assessed to have made moderate progress toward his goals.  *Id.* at 564–65.  He was reportedly able to respond to his name and use sounds, albeit inconsistently, but he could not identify family members by name or use word approximations to identify objects.  *Id.* at 564.  Using the "Revised HELP Checklist," Williams found D.K.B. to have 15.6 percent cognitive and language delays, 9 percent fine motor delay, and 12.5 percent social and self-help delays.  *Id.* at 565.

### c.  Opinion Evidence

#### i.  Stephen Tsoutsouras, M.D.—Consultative Examiner

On August 4, 2016, pediatrician Stephen Tsoutsouras, M.D., of Industrial Medicine Associates, conducted a consultative examination of D.K.B. at age 13 months.  AR at 213–16.  Dr. Tsoutsouras found that D.K.B. has asthma and should avoid smoke and allergy triggers.  *Id.* at 216.  All other examination results were normal for his age.  *Id.* at 214–15.

### ii.    June C. Parks, Ph.D.—State Agency Consultant

Licensed clinical psychologist June C. Parks, Ph.D., completed written interrogatories on April 24, 2018 based on her review of the record.  *Id.* at 622–29. Dr. Parks opined that D.K.B.'s expressive language abilities fell below the average level for children his age, but found no evidence of marked or extreme limitations in his abilities in any of the equivalence domains.  *Id.* at 623, 625.  With respect to acquiring and using information, Dr. Parks wrote that D.K.B.'s most recent evaluation showed a greater than 25 percent delay in expressive-receptive language, which impacts his ability to acquire and use information, but concluded that D.K.B. had a less than marked limitation in this domain.  *Id.* at 627.  She similarly concluded that D.K.B. had a less than marked limitation in interacting and relating with others, noting that reports indicated he becomes very frustrated and cries frequently when unable to express himself clearly to others.  *Id.*  As to moving about and manipulating objects, Dr. Parks also concluded that D.K.B. had a less than marked limitation based on observations that he was unable to perform developmentally appropriate tasks, such as completing puzzles and drawing a vertical line.  *Id.* at 628.

### iii.    M. Puttaniah, M.D.—State Agency Consultant

In connection with Afriyie's initial application for SSI benefits, state agency consultant and pediatrician M. Puttaniah reviewed the evidence in the record and concluded that, although D.K.B.'s asthma was severe, it did not meet, medically equal, or functionally equal the listings.  *Id.* at 72–73.  Dr. Puttaniah found no

limitations in any of the equivalence domains, with the exception of health and well-being, for which D.K.B. was found to have a less than marked limitation. *Id.* at 73.

### 2. ALJ Hearing

Afriyie and D.K.B. appeared *pro se* before ALJ Kanner at a hearing in the Bronx on February 22, 2018. AR at 39–67. Also present was Enoch Mensah, a social worker from All About Kids, who assisted Afriyie and D.K.B with early intervention services. *Id.* at 42, 53–54. With respect to D.K.B.'s asthma, Afriyie testified that he had received treatment over the last few years from Dr. Asante, *id.* at 50, and that he takes Albuterol, which allows him to be "more calmed" on a daily basis. *Id.* at 48.[2] She also reported that D.K.B. had received speech therapy and occupational therapy treatment for his learning delays and was "eligible and approved for [benefits through OPWDD]," or the New York State Office for People With Developmental Disabilities. *Id.* at 52.

Mensah testified that, since 2017, All About Kids had been providing D.K.B. with speech, occupational therapy, and special instruction in the home. *Id.* at 54–55. Although a team of professionals from All About Kids assists D.K.B., Mensah himself provides social services to the family and has been instrumental in securing state benefits, such as services from the OPWDD. *Id.* at 55–57. Mensah testified that D.K.B. was placed on the autism spectrum after an early intervention

---

[2] Albuterol is used to prevent side effects of asthma, such as wheezing and difficulty breathing. *See Albuterol,* U.S. NATIONAL LIBRARY OF MEDICINE: MEDLINE PLUS, https://medlineplus.gov/druginfo/meds/ a607004.html (last visited Sept.8, 2020).

assessment conducted by his agency in December 2017. *Id.* at 57–60. Based on this evaluation, he explained that the OPWDD approved D.K.B. for services, including special education. *Id.* at 57–58, 64–65. In connection with these services, Mensah confirmed that the school board would prepare an Individualized Education Program ("IEP") for D.K.B. in advance of his starting school in the fall. *Id.* at 64–65.

Concerning D.K.B.'s day-to-day abilities, Afriyie testified that D.K.B. "doesn't even say five words," despite the fact that he was almost three years old, *id.* at 62, and is therefore "very limited in his speech." *Id.* at 63. She also described D.K.B. as "get[ting] frustrated" to the point where he sits on the floor crying when he needs something, but is unable to call the names of those around him. *Id.*

## II.   DISCUSSION

### A.  Legal Standards

#### 1.  Judicial Review of Commissioner's Determinations

An individual may obtain judicial review of a final decision of the Commissioner in the "district court of the United States for the judicial district in which the plaintiff resides." 42 U.S.C. § 405(g). The district court must determine whether the Commissioner's final decision applied the correct legal standards and whether it is supported by substantial evidence. *Butts v. Barnhart*, 388 F.3d 377, 384 (2d Cir. 2004). "Substantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013) (quoting *Richardson*

*v. Perales*, 402 U.S. 389, 401 (1971)) (internal quotation marks and alterations omitted); *see also Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) ("under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains 'sufficien[t] evidence' to support the agency's factual determinations . . . whatever the meaning of 'substantial' in other contexts, the threshold for such evidentiary sufficiency is not high").

The substantial evidence standard is a "very deferential standard of review." *Brault v. Soc. Sec. Admin.*, 683 F.3d 443, 448 (2d Cir. 2012). The court "must be careful not to substitute its own judgment for that of the Commissioner, even if it might justifiably have reached a different result upon a *de novo* review." *DeJesus v. Astrue*, 762 F. Supp. 2d 673, 683 (S.D.N.Y. 2011) (quoting *Jones v. Sullivan*, 949 F.2d 57, 59 (2d Cir. 1991)) (internal quotation marks and alterations omitted). "[O]nce an ALJ finds facts, [a court] can reject those facts 'only if a reasonable factfinder would have to conclude otherwise.'" *Brault*, 683 F.3d at 448 (quoting *Warren v. Shalala*, 29 F.3d 1287, 1290 (8th Cir. 1994)) (emphasis omitted).

In weighing whether substantial evidence exists to support the Commissioner's decision, "the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn." *Selian*, 708 F.3d at 417 (quoting *Mongeur v. Heckler*, 722 F.2d 1033, 1038 (2d Cir. 1983)). On the basis of this review, the court may "enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or

reversing the decision of the Commissioner of Social Security, with or without remanding . . . for a rehearing."  42 U.S.C. § 405(g).

In certain circumstances, the court may remand a case solely for the calculation of benefits, rather than for further administrative proceedings.  "In . . . situations[ ] where this Court has had no apparent basis to conclude that a more complete record might support the Commissioner's decision, [the court has] opted simply to remand for a calculation of benefits."  *Michaels v. Colvin*, 621 F. App'x 35, 38–39 (2d Cir. 2015) (summary order) (quoting *Rosa v. Callahan*, 168 F.3d 72, 83 (2d Cir. 1999)) (internal quotation marks omitted).  The court may remand solely for the calculation of benefits when "the records provide[ ] persuasive evidence of total disability that render[s] any further proceedings pointless."  *Williams v. Apfel*, 204 F.3d 48, 50 (2d Cir. 1999).  However, "[w]hen there are gaps in the administrative record or the ALJ has applied an improper legal standard, [the court has], on numerous occasions, remanded to the [Commissioner] for further development of the evidence."  *Pratts v. Chater*, 94 F.3d 34, 39 (2d Cir. 1996) (quoting *Parker v. Harris*, 626 F.2d 225, 235 (2d Cir. 1980)) (alteration in original).

## 2.  Childhood Disability Standard

Under the Social Security Act, a child under the age of 18 is considered disabled "if that individual has a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 1382c(a)(3)(C)(i).

However, the Act excludes from coverage any individual "under the age of 18 who engages in substantial gainful activity . . . ." 42 U.S.C. § 1382c(a)(3)(C)(ii).

### a. Three-Step Inquiry

To determine whether a child is disabled, the Commissioner follows a three-step sequential evaluation process. 20 C.F.R. § 416.924(a). First, the Commissioner determines whether the child is engaged in substantial gainful activity. 20 C.F.R. § 416.924(a), (b). If so, the child is not considered to be disabled. *Id.* Otherwise, the Commissioner proceeds to step two, at which point he determines whether the child has "an impairment or combination of impairments that is severe." 20 C.F.R. § 416.924(a). If the child does not have a severe impairment, he is not considered to be disabled. 20 C.F.R. § 416.924(a), (c). If the child has a severe impairment, the Commissioner continues to step three, which requires him to decide whether the claimant's impairment or combination of impairments meets or functionally equals an impairment in the "listings." 20 C.F.R. § 416.924(a), (d). To make this determination, the Commissioner considers the child's functioning in terms of six "broad areas of functioning" called "domains." 20 C.F.R. § 416.926a(b)(1). The domains are as follows:

(i)   Acquiring and Using Information
(ii)  Attending and Completing Tasks
(iii) Interacting and Relating with Others
(iv)  Moving About and Manipulating Objects
(v)   Caring for Yourself
(vi)  Health and Physical Well-Being

*Id.*

A child is considered to be disabled if he has a "marked" limitation—that is, a limitation that "interferes seriously with [his] ability to independently initiate, sustain, or complete activities"—in at least two domains.  20 C.F.R. § 416.926a(e)(2)(i).  A marked limitation "is the equivalent of the functioning we would expect to find on standardized testing with scores that are at least two, but less than three, standard deviations below the mean."  *Id.*  Additionally, a child is considered disabled if he has an "extreme" limitation—that is, a limitation that "interferes very seriously with [his] ability to independently initiate, sustain, or complete activities"—in at least one domain.  20 C.F.R. § 416.926a(e)(3)(i) (emphasis added).  An extreme limitation "is the equivalent of the functioning we would expect to find on standardized testing with scores that are at least three standard deviations below the mean."  *Id.*

### b.  Duty to Develop the Record

"Social Security proceedings are inquisitorial rather than adversarial."  *Sims v. Apfel*, 530 U.S. 103, 110–11 (2000).  Consequently, "the social security ALJ, unlike a judge in a trial, must on behalf of all claimants . . . affirmatively develop the record in light of the essentially non-adversarial nature of a benefits proceeding."  *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009) (internal quotation marks omitted).  As part of this duty, the ALJ must "investigate the facts and develop the arguments both for and against granting benefits."  *Sims*, 530 U.S. at 111.  Specifically, under the applicable regulations, the ALJ is required to develop a claimant's complete medical history.  *Pratts*, 94 F.3d at 37 (citing 20 C.F.R.

§§ 404.1512(d)–(f).  This responsibility "encompasses not only the duty to obtain a claimant's medical records and reports but also the duty to question the claimant adequately about any subjective complaints and the impact of the claimant's impairments on the claimant's functional capacity."  *Pena v. Astrue*, No. 07-CV-11099 (GWG), 2008 WL 5111317, at *8 (S.D.N.Y. Dec. 3, 2008) (citations omitted).

Whether the ALJ has satisfied this duty to develop the record is a threshold question.  Before determining whether the Commissioner's final decision is supported by substantial evidence under 42 U.S.C. § 405(g), "the court must first be satisfied that the ALJ provided plaintiff with 'a full hearing under the Secretary's regulations' and also fully and completely developed the administrative record."  *Scott v. Astrue*, No. 09-CV-3999 (KAM) (RLM), 2010 WL 2736879, at *12 (E.D.N.Y. July 9, 2010) (quoting *Echevarria v. Sec'y of Health & Human Servs.*, 685 F.2d 751, 755 (2d Cir. 1982)); *see also Rodriguez v. Barnhart*, No. 02-CV-5782 (FB), 2003 WL 22709204, at *3 (E.D.N.Y. Nov. 7, 2003) ("The responsibility of an ALJ to fully develop the record is a bedrock principle of Social Security law.") (citing *Brown v. Apfel*, 174 F.3d 59 (2d Cir. 1999)).  Remand is appropriate where this duty is not discharged.  *See, e.g., Moran*, 569 F.3d at 114–15 ("We vacate not because the ALJ's decision was not supported by substantial evidence but because the ALJ should have developed a more comprehensive record before making his decision.").

## B.  The ALJ's Decision

In a 15-page decision dated July 12, 2018, the ALJ concluded that D.K.B. was not "disabled" under the Social Security Act.  AR at 19–34.  Following the three-step

inquiry, at step one the ALJ found that D.K.B. was a newborn/young infant on June 3, 2016, the date his SSI application was filed, and had not engaged in substantial gainful activity since the application date. *Id.* at 22. At step two, the ALJ found that D.K.B. had severe impairments of "language disorder, delayed milestone in childhood and asthma." *Id.* At step three, the ALJ found that D.K.B. did not have an impairment or combination of impairments that meets, medically equals, or functionally equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. *Id.* at 22–23. In particular, he concluded that D.K.B.'s developmental issue "implicate[d] listing 112.14," but that there were no demonstrated marked limitations in any of the paragraph B criteria. *Id.* at 23.

In analyzing the functional equivalence of D.K.B.'s impairments, the ALJ considered Afriyie's testimony but concluded that the record established that D.K.B.'s health issues are "less than marked." *Id.* at 24. The ALJ cited, in part, Afriyie's self-completed third party function report, which "admit[ted] that [D.K.B.] did not have problems seeing, hearing, or with activities or abilities generally." *Id.* (citing *id.* at 153–56).

The ALJ also considered medical evidence and weighed various opinions in the record. *Id.* He gave partial weight to Dr. Tsoutsouras's August 4, 2016 opinion that D.K.B. should avoid smoke and allergy triggers. *Id.* Partial weight was similarly given to the opinion of Dr. Puttaniah, who found that D.K.B. had no limitations in five of the six functional equivalence domains, and a less than marked limitation in the domain of physical health and well-being. *Id.* at 24–25.

The ALJ reasoned that, although Dr. Puttaniah did not examine D.K.B., the opinion was based on a review of the evidence and Dr. Puttaniah "is knowledgeable of the regulatory contemplations." *Id.* at 25.

The ALJ specifically weighed Londono's May 15, 2017 opinion in the domains relative to her specialty of physical therapy, including moving about and manipulating objects. *Id.* Her opinion (that D.K.B.'s gross motor functioning was relatively normal) was given partial weight because it was based on clinical testing for gross motor function. *Id.* (citing *id.* at 542–44). The ALJ also gave significant weight to Grogan's evaluation revealing moderately delayed receptive speech and to Zea's conclusion that D.K.B. presented delays in overall language skills, but had no difficulties learning new concepts or exercising "play skills [] at age level." *Id.* at 25–26 (citing *id.* at 526–27). The ALJ found that, taken together, the opinions supported the conclusion that D.K.B. had less than marked limitations in attending and completing tasks and interacting with others. *Id.*

The ALJ gave significant weight to Brown's August 2017 opinion that D.K.B. had good muscle tone throughout his trunk and extremities, normal locomotion, and was able to "operate simple cause and effect and emerging pretend play." *Id.* at 26 He reasoned that Brown's evaluations were corroborated by consistent present sense observations from multiple evaluators. *Id.* Partial weight was given to the other evaluators whom the ALJ explicitly acknowledged, including Banks, who evaluated D.K.B. in August 2017, Giusti, who evaluated D.K.B. in December 2017, and Williams, who completed a progress report for D.K.B. in February 2018. *Id.* at

26–27.  Although these opinions were rendered in "terms and standards distinct from the regulatory scheme" and were made in order to assess his need for supportive developmental services, the ALJ nevertheless gave them partial weight because they "offer relevant insight into [D.K.B.'s] condition and are based on careful evaluations from professionals in child services."  *Id.* at 27.

Dr. Parks' opinion acknowledging some limitations but concluding that they were all less than marked was accorded great weight.  *Id.* at 27–28.  The ALJ found her opinion to be consistent with other evidence in the record, and observed that she is "adequately informed of the regulations as a consultant to this agency."  *Id.* at 28.

As to the six functional equivalence domains, the ALJ found that D.K.B. had a less than marked limitation in acquiring and using information because he could interact and cooperate with evaluators appropriately and occasionally complete puzzles and cause and effect games.  *Id.* at 29.  The ALJ also determined that D.K.B.'s limitation in attending and completing tasks was less than marked based on Dr. Parks' opinion and D.K.B.'s ability to understand puzzles and games.  *Id.* at 30.  In interacting and relating with others, the ALJ determined that D.K.B. had a less than marked limitation based on the fact that while he had bouts of frustration and crying, he nevertheless showed "a significant amount of signs and instances of cooperative behavior with evaluators."  *Id.* at 31.  The ALJ found no limitation in moving about or manipulating objects, concluding that the "few instances" in which D.K.B. faced difficulties in this domain were "remote" in relation to the total record, which showed normal development.  *Id.* at 32.  Likewise, the ALJ determined that

D.K.B. had no limitation in the ability to care for himself because he could gesture and cry to get the attention of his caretakers and "negotiate[d] his body normally during most evaluations." *Id.* at 33.  Finally, the ALJ concluded that D.K.B. had a less than marked limitation in health and physical well-being because his early difficulties with asthma had stabilized to normal respiratory function. *Id.* at 34.

In sum, the ALJ concluded that D.K.B. did not have an impairment or combination of impairments that result in either marked limitations in two domains of functioning or extreme limitations in one domain of functioning and, therefore, was not disabled under the Social Security Act. *Id.*

## C. Analysis

Afriyie contends that the ALJ committed several errors in denying D.K.B.'s claim, including by failing: (1) to properly address and weigh standardized testing scores and other evidence in the record with respect to the functional equivalence domains; and (2) to develop an adequate record.  Pl. Mem. at 17–29.  In light of the fact that standardized testing "objectively establishes" marked limitations in two functional domains, Afriyie argues that the Commissioner's decision should be remanded solely for the calculation of benefits. *Id.* at 17, 29–30.  The Commissioner counters that the ALJ's decision is supported by substantial evidence and an adequately developed record, and should therefore be affirmed.  Def. Mem. at 15–29.  As discussed below, the Court concludes that the ALJ failed to address relevant evidence in the record, including standardized test scores, as required, and that he also failed to develop the record.  These errors warrant remand.

### 1. The ALJ Failed to Properly Consider and Weigh Relevant Evidence, including D.K.B.'s Standardized Test Scores

Afriyie claims that two sets of standardized test scores objectively establish that D.K.B. has marked limitations in several domains, and that the ALJ failed to properly consider and weigh this evidence. First, Afriyie contends that D.K.B.'s language testing results, including the December 2017 PLS-5 test, establish marked limitations in the domains of acquiring and using information and interacting and relating to others, and such evidence is not contradicted by any other evidence in the record. Pl. Mem. at 17–24. Moreover, she contends that D.K.B.s fine motor testing between August 2017 and January 2018, including his PDMS-2 results, establish a marked limitation in the domain of moving about and manipulating objects. *Id.* at 25.

The regulations describing the functional equivalence domains in childhood disability establish that the SSA

> will find that you have a 'marked' limitation when you have a valid score that is two standard deviations or more below the mean, but less than three standard deviations, on a comprehensive standardized test designed to measure ability or functioning in that domain, and your day-to-day functioning in domain-related activities is consistent with that score.

20 C.F.R. § 416.926a(e)(2)(iii). Furthermore, the SSA "will consider your test scores together with the other information we have about your functioning, including reports of classroom performance and the observations of school personnel and others." 20 C.F.R. § 416.926a(e)(4)(ii).

In this case, the ALJ failed to properly consider D.K.B.'s language testing scores in analyzing his limitations in two functional domains: acquiring and using

information and interacting and relating with others.  Although the ALJ also erred in failing to specifically address the December 2017 PDMS-2 evaluation, which concerned D.K.B.'s fine motor skills, such error was harmless as the ALJ relied on substantial evidence in analyzing D.K.B.'s fine motor skills within the domain of moving about and manipulating objects.

### a. Acquiring and Using Information

In December 2017, D.K.B.'s auditory comprehension, expressive communication, and total language scores on the PLS-5 each ranked within the first percentile and at standard deviations of -2.33, -2.46, and -2.53, respectively.  AR at 311.  According to Fernandez, the speech pathologist who administered the test, D.K.B.'s scores indicated severe delays in his auditory comprehension, expressive language skills, and his articulation and speech sound production.  *Id.* at 312–13.

Auditory comprehensive and expressive language skills are critical to the domain of acquiring and using information.  *See, e.g., Lavalley ex rel. A.W. v. Colvin,* No. 12-CV-771 (MAD) (VEB), 2013 WL 2444203, at *10 (N.D.N.Y. June 5, 2013) ("The ability to use language is of 'vital importance' to the domain of acquiring and using information.") (citing *F.M. v. Astrue,* No. 08-CV-4430 (CPS), 2009 WL 2242134, at *8 (E.D.N.Y. July 27, 2009)).  The regulations provide that children aged one to three years old should be able to refer to themselves and objects around them by pointing and naming; form concepts; respond to instructions and questions; and "produce an increasing number of words and grammatically correct simple sentences and questions."  20 C.F.R. § 416.926a(g)(2)(ii).

The Preschool Language Scale ("PLS") is commonly used as a tool in assessing a claimant's language development in the context of acquiring and using information. *See, e.g. Graves v. Colvin*, No. 14-CV-378 (GTS), 2015 WL 3901779, at *4 (N.D.N.Y. June 25, 2015) (PLS-4 test analyzed within domain of acquiring and using information); *Carrasquil ex rel. Y.R. v. Comm'r of Soc. Sec.,* No. 14-CV-66 (LEK) (ATB), 2015 WL 2452316, at *7 (N.D.N.Y. May 21, 2015) (same); *Johnson ex rel. A.J. v. Astrue*, No. 11-CV-5247 (JMF), 2013 WL 1187436, at *13 (S.D.N.Y. Mar. 22, 2013) (same). Afriyie correctly observed, therefore, that "[PLS-5] language scores in the range achieved by D.K.B. normally necessitate a finding that the child has a marked limitation in the domain." Pl. Mem. at 18 (collecting cases). As other courts within this District have determined, "[a] score at or below the first percentile satisfies the SSA's regulatory definition of a marked limitation, since the bottom 2.3 percent of any population is more than two S[tandard] D[eviation]s below the mean." *McClain v. Barnhart*, 299 F. Supp. 2d 309, 325 (S.D.N.Y. 2004) (citing *Duran v. Barnhart*, No. 01-CV-8307 (GWG), 2003 WL 103003, at *10 (S.D.N.Y. Jan. 13, 2003)).

Here, the ALJ's decision does not mention the PLS-5 test scores at all. It is well-settled in this Circuit that "an ALJ's failure to acknowledge relevant evidence or to explain its implicit rejection is plain error." *Roman v. Berryhill*, No. 17-CV-2804 (VSB)(DCF), 2018 WL 7291422, at *7 (S.D.N.Y. May 9, 2018) (collecting cases), *adopted sub nom. Roman v. Comm'r of Soc. Sec.*, 2019 WL 588464 (Feb. 13, 2019); *see also Lao v. Comm'r of Soc. Sec.*, No. 18-CV-07462 (FB), 2020 WL 4194210, at *2

(E.D.N.Y. July 21, 2020) ("An ALJ may not ignore 'relevant and probative evidence which is available.'") (citing *Lopez v. Sec'y of Dep't of Health & Human Servs.*, 728 F.2d 148, 150–51 (2d Cir. 1984)).  Moreover, the regulations provide that, "[w]hen we do not rely on test scores, we will explain our reasons for doing so in your case record or in our decision."  20 C.F.R. § 416.926a(e)(4)(iii)(B).[3]  Therefore, "the ALJ committed legal error by disregarding the import of [D.K.B.'s] low standardized test scores and failing to reconcile any conflicting [analyses] offered by the evaluators." *Robbins ex rel. Robbins v. Comm'r of Soc. Sec.,* No. 04-CV-2568 (NG)(JMA), 2006 WL 8456939, at *7 (E.D.N.Y. Jan. 25, 2006).  Indeed, relevant standardized testing scores, like those produced by the Preschool Language Scale, hold significant weight under the regulations such that courts in this Circuit have not hesitated to remand where an ALJ has failed to properly consider them.  *See, e.g.*, *Vega Olmeda ex rel. J.W. v. Comm'r of Soc. Sec.,* No. 18-CV-1177 (LJV), 2020 WL 1677379, at *6–7 (W.D.N.Y. Apr. 6, 2020) (remand warranted where PLS-5 score "could result in a finding of at least marked limitations" in domains of acquiring and using information and interacting and relating with others and ALJ erred in developing

---

[3] The Commissioner argues that this regulation "do[es] not require an ALJ to explain why he did not rely on test scores," but rather mandates that "when SSA does not rely on test scores it will explain the reasons in the case record or in the decision."  Def. Mem. at 23 n.8.  The Court disagrees. *See, e.g.*, *Garcia v. Colvin*, No. 12-CV-5886 (KBF), 2015 WL 7758533, at *9 (S.D.N.Y. Dec. 1, 2015) ("The SSA regulations require that when the ALJ chooses not to rely on test scores at or below two standard deviations of the mean, he must "explain [the] reasons for doing so." (citing 20 C.F.R. § 416.926a(e)(4)(iii)(B))).  However, this distinction is immaterial where, as here, the ALJ both failed to explicitly address his reasons for ignoring the test scores and did not offer reasons sufficient to support his decision as to this functional domain without reference to the scores themselves.

record with respect to this analysis); *Robbins*, 2006 WL 8456939, at *7 (case remanded for calculation of benefits where PLS-III score three standard deviations below mean established extreme limitation in domain of acquiring and using information).

Having determined that the ALJ committed legal error by failing to consider D.K.B.'s PLS-5 test score, the Court next considers whether that error was harmless. *See Zabala v. Astrue,* 595 F.3d 402, 410 (2d Cir. 2010) (remand not warranted where "application of the correct legal principles to the record could lead [only to the same] conclusion"). "[I]f there was substantial evidence in the record for the ALJ to find that [D.K.B.'s] day-to-day functioning was not consistent with [his] score" on the PLS-5, his "performance on that test would not be dispositive of the question of whether [he] had a marked limitation in the domain of acquiring and using information." *Ruano Juarez ex rel. R.R.O. v. Berryhill*, No. 18-CV-189 (LMS), 2019 WL 2162120, at *3 (S.D.N.Y. May 16, 2019), *aff'd sub nom. Juarez ex rel. R.R.O. v. Saul*, 800 F. App'x 63 (2d Cir. 2020). Accordingly, the regulation "does not compel a finding of disability based on one standardized test," but rather the ALJ must "consider all of the relevant information in [the] case record and will not consider any single piece of evidence in isolation." *Miles ex rel. J.M. v. Astrue*, 502 F. App'x 59, 61 (2d Cir. 2012) (citing 20 C.F.R. § 416.926a(e)(2)(ii)). In this case, because "considering the effect of [D.K.B.'s test scores] on his ability to acquire and use information might have led the ALJ to find that [D.K.B.] had a marked

27

limitation in that domain," the error was not harmless.  *Vega Olmeda*, 2020 WL
1677379, at *6.

The ALJ never discussed D.K.B.'s language impairments in the context of
acquiring and using information.  Rather, he found that D.K.B. had a less than
marked limitation in this domain because, although he occasionally exhibited
difficulties with puzzles and cause and effect games, he was sometimes able to
perform them adequately, and he also effectively cooperated with evaluators.  AR at
29.  However, "[f]or a child to have a marked or extreme limitation in a particular
domain, not all activities or functions encompassed by the domain need be
impaired."  *McClain*, 299 F. Supp. 2d at 315.  Therefore, "a marked disability in one
area of acquiring and using information," such as comprehensive and expressive
language skills, would "not [be] cancelled out" by a finding that D.K.B. has a less
than marked limitation in other areas of the domain, such as completing puzzles or
solving problems.  *F.M.,* 2009 WL 2242134, at *9.

D.K.B.'s language was tested on three separate occasions in 2017.  AR at
309–13, 491–501, 532–41.  Although the December 2017 assessment was the only
testing that yielded scores measured by standard deviation, each test indicated
significant impairments in D.K.B.'s language ability. *See id.* at 274 (August 2017
evaluation finding greater than 25 percent delay in expressive and receptive
language); 311 (December 2017 PLS-5 evaluation finding total language score in
first percentile); 520 (May 2017 evaluation finding "severe" expressive language
delay of 33 percent).  Despite the Commissioner's arguments that the ALJ relied on

occasions of normal functioning with respect to other capacities related to this domain (such as solving puzzles and cooperating with evaluators), the fact remains that the ALJ's analysis in this domain did not adequately account for the PLS-5 or any other language testing results.[4]  Because the ALJ failed to reconcile these scores with his conclusions regarding acquiring and using information, the Court cannot conclude that he relied on substantial evidence in his analysis of the domain. *See, e.g.*, *Snell v. Apfel*, 177 F.3d 128, 134 (2d Cir. 1999).

### b.  Interacting and Relating with Others

"Under the regulations, impairments in expressive language ability are germane not only to the domain of acquiring and using information, but also to the domain of interacting and relating with others."  *Miles ex rel. J.M. v. Astrue*, 775 F. Supp. 2d 715, 726 (S.D.N.Y. 2011) (citing 20 C.F.R. §416.926a(i)(2)(iv)); *see also Johnson,* 2013 WL 1187436, at *13 n.1 ("'[A] child's problems with speech and

---

[4] The Court is unpersuaded by the Commissioner's argument that the ALJ's conclusion is supported by Dr. Parks' opinion.  Def. Mem. at 20 (citing AR at 627). First, the fact that Dr. Parks "specifically noted" D.K.B.'s "most recent language evaluation" showed a 25 percent delay in expressive-receptive communication, AR at 627, suggests that she did not accurately account for the full record, as D.K.B.'s most recent assessment was the December 2017 evaluation, which found a greater than 33 percent delay in articulation and speech production and a total language score at a standard deviation of 2.53 below the mean.  *Id.* at 311–13.  Second, as discussed in greater detail below, Dr. Parks' opinions are lacking in explanation.

The Court also rejects the Commissioner's argument that the PLS-5 test is an improper gauge of D.K.B.'s abilities because it was given in English, but Twi is the primary language spoken at home.  Def. Mem. at 21–22 (citing AR at 524).  This argument is unavailing in light of evidence from evaluators that "English is the dominant language spoken in the home with minimal exposure to Twi," AR at 492, D.K.B. "produces no words in Twi," *id.,* D.K.B. did not respond to Twi, *id.* at 532, and D.K.B.'s "dominant language is English," *id.* at 532, 534.

language need to be assessed in both the 'acquiring and using information' domain
and the 'interacting and relating with others' domain.'") (*quoting Kittles v.
Barnhart*, 245 F. Supp. 2d 479, 489 (E.D.N.Y. 2003)).  Accordingly, the Preschool
Language Scale is also used to analyze a child's limitations under the domain of
interacting and relating with others.  *See, e.g., Lavalley,* 2013 WL 2444203, at *13
(PLS-4 score in 3rd percentile evidence of extreme limitation in domain of
interacting and relating with others).

Here, just as he did with the domain of acquiring and using information, the
ALJ neglected to analyze the extent to which D.K.B.'s language impairment as
measured by his standardized test scores affected his functioning in the domain of
interacting and relating with others.  The failure to do so is also legal error.  20
C.F.R. §§ 416.926a(e)(2)(iii), 416.926a(e)(4)(ii); *see also Rodriguez ex rel. Mena v.
Astrue,* No. 10-CV-305 PKC, 2011 WL 2923861, at *6 (S.D.N.Y. July 7, 2011) ("Legal
error may include failure to adhere to the applicable regulations.") (citing *Kohler v.
Astrue*, 546 F.3d 260, 265 (2d Cir. 2008)).

With respect to this domain, the ALJ reasoned that D.K.B. had a less than
marked limitation because, although he experiences frustration and bouts of crying
(which notably the ALJ classified as "reasonably problematic . . . especially given
the receptive and expressive delays"), there were a number of instances in which
D.K.B. exhibited "cooperative behavior with evaluators."  AR at 31.  This cursory
analysis failed to adequately account for the full range of factors that impact
D.K.B.'s functioning in interacting and relating with others.  In particular, similar

to the domain of acquiring and using information, the fact that D.K.B. may function appropriately in one area of the interacting and relating to others domain, such as social cooperation, is not dispositive as D.K.B.'s deficiencies in other areas of that domain, such as language impairments, may warrant a finding of an overall marked limitation. "[T]he SSA now takes the position that a child with speech-language deficits at the marked level will normally be found to have a marked limitation in the domain of interacting and relating with others, *even though socially well-behaved.*" *Smith ex rel. B.L.S. v. Berryhill,* No. 16-CV-203 (VF), 2019 WL 1486680, at *5 (W.D.N.Y. Apr. 4, 2019) (emphasis added) (citing *McClain*, 299 F. Supp. 2d at 326 n.18). Therefore, the instances in which D.K.B. was reasonably cooperative with evaluators do not negate the potential for his language delays to independently produce a marked limitation in this domain.

On remand, the ALJ should address the effects of D.K.B.'s language impairment in this domain, with specific reference to his language testing that showed impairment at the marked level. *See, e.g.*, *Dunaway ex rel. E.B. v. Colvin*, No. 14-CV-6301 (MWP), 2015 WL 5712297, at *15 (W.D.N.Y. Sept. 29, 2015) (remanding where "ALJ's decision does not demonstrate that he fully and adequately considered the [e]ffect of [child's] demonstrated severe speech and language delays in assessing her limitations in the domain of interacting and relating with others").

### c.  Moving About and Manipulating Objects

The record includes three objective test results from 2017 that reflect D.K.B.'s fine motor impairments.  D.K.B. was measured to have an FMQ of 73 in August 2017, AR at 281, which went down to 67 in December 2017, *id.* at 316, and which dipped even further to 64 in January 2018, *id.* at 570.  Respectively, these FMQs reflect standard deviations of 1.80, 2.20, and 2.30 below the mean.  *Id.* at 281, 316, 570.

Afriyie argues that the regulation "expressly states that delayed fine motor functioning at the marked level is sufficient to establish a marked limitation for the domain as a whole."  Pl. Mem. at 25 (citing 20 C.F.R. § 416.926a(j)(3)(iv)–(vi).  Under the regulation, difficulties with "sequencing hand or finger movements," "fine motor movement," and "eye-hand coordination when using a pencil or scissors" are all examples of limited functioning in this domain.  20 C.F.R. § 416.926a(j)(3)(iv)–(vi).  However, the examples "do not necessarily describe a 'marked' or 'extreme' limitation," and the SSA "will consider all of the relevant information" in a claimant's case when deciding whether the impairments cause a marked or extreme limitation in the domain.  20 C.F.R. § 416.926a(j)(3).

The ALJ found that D.K.B. had no limitation in moving about and manipulating objects, as he was "developing normally in this domain throughout the period under adjudication."  AR at 32.  Additionally, the ALJ reasoned that the "few instances of difficulty in the record are remote."  *Id.*

It is true that courts have recognized that a low FMQ can signify difficulties associated with a marked limitation in the domain of moving about and manipulating objects. *See, e.g. Carrasquil,* 2015 WL 2452316, at (ALJ found marked limitation in moving about and manipulating objects, in part, based on PDMS-2 score two deviations below mean); *Baez ex rel. D.J. v. Colvin,* No. 6:13-CV-142 (DNH)(TWD), 2014 WL 1311998, at *11 (N.D.N.Y. Mar. 31, 2014) (FMQ score in third percentile lent support to significant impairment affecting domain of moving about and manipulating objects); *see also Allen v. Colvin*, No. 16-CV-194, 2016 WL 7102723 at *5 (E.D. Mo. Dec. 6, 2016) (case remanded where claimant's FMQ in first percentile based on PDMS, and "ALJ's decision [did] not address some objective medical evidence that arguably proves [the claimant] was more than two standard deviations below the mean for fine motor skills, which is the definition of marked limitations in the domain of moving about and manipulating objects").

As the Commissioner correctly notes, however, the ALJ did "not rely on any test score alone." Def. Mem. at 27 n.9 (citing 20 C.F.R. § 416.926(a)(e)(4)(i)). Unlike the ALJ's analysis of D.K.B.'s language impairment with respect to the domains of acquiring and using information and interacting and relating with others, it is not the case that the ALJ entirely ignored D.K.B.'s PDMS-2 scores and low FMQs in reaching a conclusion as to moving about and manipulating objects. Rather, the ALJ explicitly considered all but one of D.K.B.'s low PDMS-2 scores and placed them in the context of other evidence in the record, including later evaluations by providers, to find that D.K.B. did not have a limitation in this domain. For

example, the ALJ explicitly considered the PDMS-2 assessment conducted by Banks

in the August 14, 2017 finding that D.K.B. had a 25 percent fine motor delay.  AR at

27 (citing *id.* at 280–84).  The ALJ observed that this evaluation demonstrated that

D.K.B.'s fine motor impairments "did not necessitate supportive therapy or

treatment."  *Id.* at 27.  The ALJ also considered the January 21, 2018 PDMS-2

evaluation by Lawrence and Darien, which found a 30 percent delay in D.K.B.'s fine

and visual motor skill development.  *Id.* (citing *id.* at 567–71).  Although the ALJ

made note of several specific fine motor difficulties identified in the evaluation,

including D.K.B.'s need for physical assistance in grasping a spoon, the evaluators

also explained that D.K.B.'s "functional performance and progress had been

hindered by his behavior and lack of task focus and attention."  *Id.*

The only PDMS-2 evaluation that the ALJ did not consider was the December

2017 assessment conducted by Adza, which found that D.K.B. had an FMQ of 67, a

standard deviation of 2.2 below the mean.  *See id.* at 314–18.  This oversight

constitutes legal error.  *See, e.g.*, *Roman,* 2018 WL 7291422, at *7.  However, the

ALJ's consideration of the rest of the record with respect to this domain

demonstrates that this error was harmless, because substantial evidence existed in

the record for the ALJ to find that D.K.B.'s day-to-day fine motor functioning was

not consistent with his PDMS-2 score.  *See Ruano Juarez,* 2019 WL 2162120, at *3.

In particular, in addition to the aforementioned PDMS-2 evaluations, the ALJ

considered Brown's August 2017 evaluations under the DAYC-2 and HELP Strands

Developmental Assessment, finding that D.K.B. could "operate a cause and effect

pop up toy by pushing buttons and twisting a lever," and moved beads around on a beaded toy.  AR at 26 (citing *id.* at 257).  Afriyie reported to Brown that her son could move about and sit in a controlled fashion, carry a toy while walking, and walk without holding on, and Brown observed D.K.B. throw a toy overhead and twist a knob with several fingers.  *Id.* at 258.  Moreover, the ALJ considered the February 2018 progress report from Williams (conducted after the overlooked December 2017 assessment), finding that D.K.B. had made progress in his fine motor skills to the point where he was functioning with only a 12.5 percent delay. *Id.* at 27 (citing *id.* at 563–66).  Williams observed that D.K.B. was beginning to hold pencils the correct way, make marks on paper, make snips with scissors, build towers, and pick up small objects.  *Id.* at 564–65.

"In reviewing the ALJ's decision, this Court does not re-weigh the evidence."  *Martinez v. Comm'r of Soc. Sec.*, No. 18-CV-1570 (KHP), 2019 WL 3852439, at *10 (S.D.N.Y. Aug. 16, 2019) (citation omitted).  Where substantial evidence in the administrative record supports "disparate findings," the Court must defer to the ALJ's factual determinations.  *Quinones ex rel. Quinones v. Chater,* 117 F.3d 29, 36 (2d Cir. 1997).  Because he relied on substantial evidence consisting of several standardized tests as well as reports of D.K.B.'s day-to-day functioning by Afriyie and his evaluators, the ALJ did not err in concluding that D.K.B. was not markedly limited in moving about or manipulating objects.

### 2.  The ALJ Did Not Fully Develop the Record

Afriyie argues that the ALJ failed to develop an adequate record by neglecting to elicit further testimony from Dr. Parks about the basis for her opinions, and by failing to obtain records that address the severity of D.K.B.'s asthma and his possible placement on the autism spectrum.  Pl. Mem. at 28–29. The Court agrees, and directs the ALJ to develop the record more fully on remand.

### a.  The ALJ Failed to Elicit the Rationale for Dr. Parks' Opinion

The only opinion in the record to which the ALJ gave great weight was that of non-examining medical expert Dr. Parks, a clinical psychologist.  AR at 28, 603. Although the ALJ relied heavily on Dr. Parks' conclusions, her opinion does little to explain the basis for her determinations.  Indeed, her evaluation consists of one-sentence explanations for her assessment of D.K.B.'s abilities under each domain that often fail to explain her conclusions. *See id.* at 622–29.  For example, in opining that D.K.B. had a less than marked limitation in acquiring and using information, Dr. Parks merely stated that D.K.B.'s "most recent evaluation shows that [D.K.B.] has greater than 25% delay in expressive-receptive language (exhibit 11F (164), which would impact [his] ability to acquire and use information." *Id.* at 627.  This explanation is not only inaccurate (as it apparently relies on D.K.B.'s August 2017 evaluations rather than the December 2017 assessment finding a greater than 33 percent delay in articulation and speech sound production, *id.* at 313), but it also provides no rationale for finding his limitation to be less than marked.  Similarly, Dr. Parks found D.K.B.'s limitation in interacting and relating

with others to be less than marked, rather than marked or extreme, despite the fact that her one-sentence explanation, if anything, suggests that D.K.B. has a severe limitation in this domain. *See id.* at 627 ("Records indicate that [D.K.B.] becomes very frustrated and cries a lot when unable to express himself clearly to others (exhibit 11F)."). In short, several of Dr. Parks' explanations support findings of marked limitations among the domains and fail to provide a basis for concluding that D.K.B. had less than marked limitations. *See id.* at 627–28.

Under the regulations, the appropriate weight given to an opinion such as Dr. Parks' depends on the degree to which those opinions are explained. 20 C.F.R. § 416.927(c)(3) ("[B]ecause nonexamining sources have no examining or treating relationship with [the claimant], the weight [given to] their opinions will depend on the degree to which they provide supporting explanations for their opinions."). In this case, Dr. Parks "provided almost no 'supporting explanations' and, consequently, her testimony, at least on the record before the ALJ, was not entitled to the 'significant' weight it was given." *Molina v. Colvin*, No. 15-CV-8088 (JLC), 2016 WL 7388374, at *3 (S.D.N.Y. Dec. 20, 2016) (quoting 20 C.F.R. § 416.927(c)(3)); *see also, e.g., Whitehurst v. Berryhill,* No. 16-CV-1005 (MAT), 2018 WL 3868721, at *3 (W.D.N.Y. Aug. 14, 2018) ("Courts in this Circuit have consistently held that 'lack of supporting detail and/or objective findings provides a . . . reason for affording [an] opinion less weight.'") (quoting *Wright v. Colvin,* No. 12-CV-0440 (MAD)(VEB), 2013 WL 3777187, at *15 (N.D.N.Y. July 17, 2013)).

The ALJ gave great weight to Dr. Parks' opinion because he concurred with her ultimate conclusion after an independent review of the record, and reasoned that, as an SSA consultant, she was "adequately informed of the regulations."  AR at 28.  These reasons are inadequate to overcome the fact that, as plaintiff aptly characterized, Dr. Parks' "explanations are virtually non-existent."  Pl. Mem. at 23. Accordingly, remand is appropriate on this basis as well in order to allow the ALJ to solicit additional testimony from Dr. Parks regarding the basis for her opinions, and then reassess the amount of weight to be given to her opinion.  *See, e.g.*, *Torres v. Comm'r of Soc. Sec.*, No. 14-CV-6712 (BMC), 2015 WL 7281640, at *6 (E.D.N.Y. Nov. 16, 2015) (remanding where ALJ did not sufficiently explain why opinion of non-examining source who gave two-sentence explanation was entitled to any weight).  Additionally, Dr. Parks is a clinical psychologist and does not appear to have any qualifications specific to the areas of speech and language development. *See* AR at 603–11 (Résumé of Dr. Parks).  Therefore, while revisiting his analysis of Dr. Parks' opinion on remand, the ALJ should ensure that he assigns her opinion proper weight in accordance with her specialty.  *See* 20 C.F.R. § 416.927(c)(5) ("We generally give more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist.").

### b.  The ALJ Failed to Request Records Related to D.K.B.'s Placement on the Autism Spectrum

A review of the record also suggests that the ALJ failed to obtain additional medical records relating to D.K.B.'s placement on the autism spectrum, or

alternatively to clarify that they do not exist.  At the hearing, Mensah testified that D.K.B. was evaluated and placed on the autism spectrum.  AR at 57–58.  In response, the ALJ noted that this evaluation was not in the record but he "want[ed] to be sure to get a copy of that."  *Id.* at 60.  After Mensah stated that he had a copy of the evaluation at the hearing, the ALJ asked to make a photocopy after the hearing was finished.  *Id.* However, this evaluation does not appear in the record.

The Commissioner argues that Mensah "apparently confused [D.K.B.] with [his] brother."  Def. Mem. at 28 (citing AR at 258, 272, 546) (referring to the fact that D.K.B.'s older brother is on the spectrum).  It does not necessarily follow from the fact that the aforementioned evidence does not appear in the record that Mensah was "clearly mistaken" in his testimony about D.K.B.'s placement on the spectrum.  *See* AR at 57 (testimony from Mensah that "those evaluations revealed that he is on the spectrum – the autism spectrum").  It is not clear what effort, if any, the ALJ made to obtain these records, either from All About Kids or from the New York State OPWDD, or to clarify that they do not exist (and confirm that Mensah was, in fact, mistaken in his testimony).  "Without dispute, the ALJ has an obligation to develop the record in light of the non-adversarial nature of the benefits proceedings regardless of whether claimant is represented by counsel."  *Greene v. Comm'r of Soc. Sec.*, No. 18-CV-137 (DB), 2019 WL 2422429, at *5 (W.D.N.Y. June 7, 2019) (citing *Shaw v. Chater*, 221 F3d 126, 131 (2nd Cir. 2000)).  This error should be remedied on remand as well.

### c. The ALJ Failed to Request Additional Records from D.K.B.'s Pediatrician

Afriyie testified that Dr. Asante, D.K.B.'s pediatrician, had treated D.K.B. regularly since 2015 for all symptoms, including asthma, and that she had taken D.K.B. to see Dr. Asante approximately 10 times in 2017.  AR at 50–51.  During the hearing, the ALJ explained that he planned to request records from Dr. Asante as well as collect records that Afriyie brought with her to the hearing, including some of Dr. Asante's notes.  *Id.* at 50.  However, the most recent treatment notes included in the record from Dr. Asante are from October 4, 2016.  *See id.* at 225–36.[5] Therefore, at the time the ALJ made his decision, the only treatment notes from a treating physician before him were from the first year of D.K.B.'s life.  An additional year and several months of treatment notes from Dr. Asante could provide further insight on the limitations imposed by D.K.B.'s asthma, as well as any other developmental limitations.  *See, e.g.*, *Rosa v. Callahan*, 168 F.3d 72, 79 (2d Cir.1999) ("scant record" presents lost opportunities for ALJ to develop the record). The ALJ is instructed to solicit these records on remand.[6]

---

[5] The parties dispute whether the notes included in the record from Dr. Asante at exhibit 10F were solicited by the ALJ after the hearing or were entered into the record when Afriyie offered them to be photocopied on the day of the hearing. *Compare* Def. Mem. at 28 *with* Pl. Reply at 9.  It appears that the notes were not entered into evidence at the hearing because they were not proffered to Afriyie in the same way as exhibits 11F–14F, which were sent by mail to her in April 2018 along with the explanation: "I have secured additional evidence that I propose to enter into the record."  *See* AR at 199–202.

[6] It is not clear, as Afriyie suggests, that there are additional medical records missing from emergency room visits.  *See* Pl. Mem. at 28.  In particular, the two hospitals Afriyie lists as those to which D.K.B. was taken for emergency treatment are Bronx Lebanon Hospital and Montfiore North Division Hospital.  AR at 169.  Of

### d. The ALJ Should Solicit Additional Testimony from Afriyie

Although other issues described in this Opinion and Order present more significant concerns with respect to the disability determination, it is also worth noting that the ALJ was not "particularly inquisitive" of Afriyie at her hearing, despite the fact that she appeared *pro se*. *Molina,* 2016 WL 7388374, at *4. The transcript of the hearing is 28 pages, AR at 39–67, but the vast majority of the ALJ's examination of Afriyie involved asking whether additional medical records exist and discussing D.K.B.'s asthma condition. *See* AR at 41–53. The ALJ only prompted Afriyie to describe the day-to-day effects of D.K.B.'s learning disabilities twice: first, he asked Afriyie to "describe [D.K.B.'s] behavior," *id.* at 62, and later he requested that she describe the "kinds of things [] he do[es] during the day," *id.* at 63. Otherwise, the ALJ asked no follow-up questions and appeared to rely almost entirely on the testimony of Mensah to understand D.K.B.'s evaluations and supportive services. *Id.* at 53–64. This lack of questioning represents a "host of lost opportunities where [the ALJ] should have questioned [Afriyie] more fully concerning various aspects of [her] testimony." *Torres v. Barnhart*, No. 02-CV-9209 (AJP), 2007 WL 1810238, at *10 (S.D.N.Y. June 25, 2007); *see also Anderson v. Comm'r of Soc. Sec.*, No. 01-CV-3330 (WHP) (JCF), 2002 WL 31045861, at *3 (S.D.N.Y. May 31, 2002) ("[T]he ALJ never conducted a detailed inquiry that might

---

those two facilities, records from Bronx Lebanon Hospital are in the record, *see id.* at 204–11, and the Commissioner requested records from Montefiore but received a response that "no documents [were] found." Def. Mem. at 28 (citing AR at 212, 218).

have yielded useful, precise information about [plaintiff's] complaints, thereby failing to adequately develop the record.").

The ALJ's failure to ask more questions of Afriyie with respect to her son's learning delays is particularly concerning for two reasons.  First, she appeared *pro se* at her hearing and, under these circumstances, an ALJ has a "heightened duty to develop the record and conscientiously to explore all relevant facts."  *Cooper v. Heckler*, No. 84-CV-1055 (JAC), 1985 WL 77598, at *3 n.5 (D. Conn. Sept. 4, 1985) (claimant represented by lay person at administrative hearing); *see also, e.g.*, *Cruz v. Sullivan,* 912 F.2d 8, 11 (2d Cir. 1990) ("[W]hen the claimant is unrepresented, the ALJ is under a heightened duty to scrupulously and conscientiously probe into, inquire of, and explore for all the relevant facts.") (citation omitted).  Second, in finding that D.K.B.'s impairments were less than marked, the ALJ concluded that "[Afriyie's] expressed testimony does not really betray the less than marked issues either."  AR at 24.  The testimony to which he referred is the third-party functionality report, in which the ALJ claims Afriyie "admit[s] that the claimant did not have problems seeing, hearing or with activities or abilities generally."  *Id.* (citing *id.* at 153–57).  However, Afriyie authored this third-party function report on June 7, 2016, when D.K.B. was 11 months old.  *Id.* at 153.  The document was included as part of Afriyie's original application for benefits, filed nearly two years before the hearing and more than two years before his decision was rendered.  During this time, D.K.B. switched age categories under the regulations, from "Newborns and young infants (birth to attainment of age 1)" to "Older infants and

toddlers (age 1 to attainment of age 3)."  *See* 20 C.F.R. §§ 416.926a(g)(2)(i)–(ii).  This

transition means that D.K.B. was expected to have grown and developed certain

cognitive capacities and physical and language abilities.  *Id.*  Moreover, as the ALJ

himself recognized at the hearing, the original disability application was premised

upon D.K.B.'s asthma, but "since that time," he had begun to suffer other significant

"developmental delays."  AR at 48.  It was therefore an error for the ALJ to have

relied on Afriyie's June 2016 report as support for the characterization that she did

not believe or admit that her son has impairments regarding his activities or

abilities.  *See id.* at 24.  More developed testimony from Afriyie would have provided

additional first-hand observations of the ways in which D.K.B.'s impairments

manifest in daily life.  On remand, the ALJ should question Afriyie more

thoroughly.

### 3.  The Case is Remanded for Further Proceedings

The Court is sympathetic to the difficulties associated with the protracted

timeline of D.K.B.'s claim, which was filed more than four years ago, and cognizant

that "[d]elay . . . 'is harmful for any litigant, but particularly in connection with

benefits for children, which are not to replace lost income, but to enable low-income

families to afford special education, medical treatment, physical rehabilitation,

early intervention services, and personal needs assistance for the child.'"  *Vazquez*

*ex rel. J.V. v. Colvin,* No. 13-CV-6372P (MWP), 2015 WL 1241251, at *23 (W.D.N.Y.

Mar. 18, 2015) (quoting *Nieves ex rel. Nieves v. Barnhart,* No. 02-CV-9207 (RWS),

2004 WL 2569488, at *10 (S.D.N.Y. Nov. 12, 2004), *amended on reconsideration on*

*other grounds*, 2005 WL 668788 (Mar. 23, 2005)).  Nevertheless, "absent a finding that the claimant was actually disabled, delay alone is an insufficient basis on which to remand for benefits." *Bush v. Shalala*, 94 F.3d 40, 46 (2d Cir. 1996). Indeed, "remanding solely for the calculation of benefits is considered an extraordinary action." *Robinson ex rel. A.A.M. v. Comm'r of Soc. Sec.*, No. 19-CV-06172 (JJM), 2020 WL 4333339, at *6 (W.D.N.Y. July 28, 2020).

The present case is not one in which "the record provides persuasive proof of disability and a remand for further evidentiary proceedings would serve no purpose." *Parker,* 626 F.2d at 235.  There are numerous gaps in the record that the ALJ failed to fill, both in development of the record and in consideration of the evidence before him.  For example, while the Court has identified that the ALJ overlooked the crucial importance of standardized testing, these scores, by themselves, are not dispositive of a disability if the ALJ finds, based on substantial evidence, that D.K.B.'s day-to-day language functioning is not consistent with those scores.  *See* 20 C.F.R. § 416.926a(e)(2)(iii); *see also Johnson*, 2013 WL 1187436, at *13 ("[A]s long as there was sufficient evidence for the ALJ to conclude that [a claimant's] day-to-day functioning was not consistent with her score [between two and three standard deviations below the mean] on the PLS-4, her performance on that test was not dispositive.").  A remand for further proceedings in the circumstances presented here is therefore "more appropriate to allow the ALJ to more fully develop the record[.]" *Santos v. Astrue*, 709 F. Supp. 2d 207, 213 (S.D.N.Y. 2010).

## III. CONCLUSION

For the foregoing reasons, Afriyie's motion is granted in part and denied in part, the Commissioner's cross-motion is denied, and the case is remanded for further administrative proceedings.  On remand, the ALJ should:

1) address the significance of D.K.B.'s PLS-5 scores and his language impairments with respect to the domains of acquiring and using information and interacting and relating with others;

2) solicit more complete explanations from Dr. Parks as to her opinions and re-evaluate her opinions, as necessary, in light of her explanations and qualifications, as well as other evidence in the record;

3) request records from D.K.B.'s social service agency and treating pediatrician, or otherwise clarify that they do not exist; and

4) question Afriyie more thoroughly at the next hearing.

The Clerk is directed to close Docket No. 17 and mark it as granted in part and denied in part, to close Docket No. 24 and mark it as denied, and to enter judgment for plaintiff remanding the case pursuant to sentence four of 42 U.S.C. § 405(g).

**SO ORDERED.**

Dated: September 10, 2020
        New York, New York

JAMES L. COTT
United States Magistrate Judge